FIRST BANK AND TRUST COMPANY

v.

CITY OF PROVIDENCE et al.

No. 2001–140–Appeal.

Supreme Court of Rhode Island.

July 1, 2003.

Richard Riendeau, Esq., Providence, for Plaintiff.

Richard Simms, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

The City of Providence (city) and Bears Brothers Realty, a Rhode Island general partnership (Bears Brothers), (collectively defendants), are before the Supreme Court on appeal from a declaratory judgment in

favor of the plaintiff, First Bank and Trust Company (First Bank or plaintiff)[1] that followed the city collector's scheduled tax sale of several unimproved parcels of land.[2] The judgment was based upon the trial justice's interpretation of G.L.1956 § 44–9–1.[3] Codefendants James J. DiStefano, Inc., Pension Trust and Mount Hope Realty filed cross-claims against the city for the amount paid at the tax sale if the tax sale is deemed to be void.[4]

### Facts and Travel

On December 23, 1992, Elmgrove Associates (Elmgrove), the record owner, granted a mortgage to First Bank for property at 533–547 Hartford Avenue and 195–197 Glenbridge Avenue in Providence (the property).[5] In March 2000, the city issued a notice of tax sale informing Elmgrove that the property was to be auctioned for nonpayment of taxes on May 18, 2000. In addition, on March 28, 2000, pursuant to § 44–9–11, the city notified the mortgagee, First Bank, that it would be selling the property for nonpayment of taxes for tax years 1995 through 1999.

Finally, the city collector posted notice of the impending tax sale in three public places and, in accordance with § 44–9–9, provided notice by publication for the requisite period.

On May 17, 2000, one day before the scheduled tax sale, Elmgrove executed and delivered a quitclaim deed conveying the property to First Bank.[6] The plaintiff recorded the deed on the same day and also delivered to the city collector five checks, a separate check for each of the five parcels, totaling $18,040. Each check specified that the amount on the check represented the payment for outstanding taxes for the years 1998 and 1999, including interest. Although First Bank designated the checks as payment for the 1998 and 1999 taxes, the city applied the checks to the oldest outstanding taxes. First Bank acknowledges that its intent in obtaining the deed from Elmgrove was to achieve an alienation of the property sufficient to trigger the provisions of § 44–9–1(b), thus terminating the tax liens for the years 1995 through 1997 and avoiding payment for

1. First Bank has since merged into The Washington Trust Company.

2. The other named defendants, James J. DiStefano, Inc., Pension Trust, Title Investments, and Mount Hope Realty, along with Bears Brothers, purchased the property from the tax sale. Specifically, lot Nos. 232 and 236 were sold to Bears Brothers; lot No. 233 was sold to codefendant Mount Hope Realty; lot No. 234 was sold to codefendant Title Investments; lot No. 235 was sold to codefendant James J. DiStefano, Inc., Pension Trust. However, only Bears Brothers has participated in the briefing and argument.

3. General Laws 1956 § 44–9–1 provides as follows:
   "**Tax lien on real estate.**—(a) Taxes assessed against any person in any town for either personal property or real estate shall constitute a lien on the real estate. The lien shall arise and attach as of the date of

assessment of the taxes, as defined in § 44–5–1.
   (b) The lien shall terminate at the expiration of three (3) years thereafter if the estate has in the meantime been alienated and the instrument alienating the estate has been recorded; otherwise, it shall continue until a recorded alienation of the estate. The lien shall be superior to any other lien, encumbrance, or interest in the real estate whether by way of mortgage, attachment, or otherwise, except easements and restrictions."

4. The record contains no other cross-claims filed by any of the other tax sale purchasers.

5. The property is more particularly described as tax assessor's plat 113, and is composed of lot Nos. 232 through 236.

6. We note that this quitclaim deed contained a recitation that the "[c]onsideration is such that no documentary stamps are required."

those years. However, the next day the city proceeded with the scheduled tax sale, and defendants purchased the lots separately.

First Bank filed a complaint seeking a declaratory judgment that the city's lien for tax years 1995, 1996 and 1997 terminated, pursuant to the provisions of § 44–9–1, when the lots were conveyed to First Bank by Elmgrove and the deed was recorded before the tax sale. Consequently, First Bank argues that the tax sale on May 18 was void *ab initio* because the previous liens had terminated pursuant to § 44–9–1(b) and the remaining outstanding taxes had been paid, notwithstanding the city's refusal to apply the payments to the years that plaintiff specified. Based upon the evidence presented at trial, the trial justice agreed and held that the quitclaim deed from Elmgrove to First Bank that was dated and recorded on May 17, 2000, terminated the city's lien for unpaid taxes that were at least three years old. He found no reason to declare the deed void or deficient in any manner.[7] In addition, the trial justice concluded that the city should have applied the five checks totaling $18,040 that plaintiff delivered on May 17, 2000 to the 1998 and 1999 real estate taxes. As noted on the checks and in the accompanying letter, these checks represented payment in full of the 1998 and 1999 real estate taxes plus interest. Finally, the trial justice found that the May 18, 2000 tax sale of lot Nos. 232 through 236 on assessor's plat 113 was void *ab initio* because "[f]rom the time the deed to the plaintiff was recorded, the [c]ity no longer possessed a lien on the property for the years 1995, 1996, and 1997." As a result, the trial justice declared First Bank the title owner of the property, subject only to

the real estate taxes for 2000, and he ordered the city to reimburse the codefendants for the sums they paid at the tax sale.

**Issues Presented**

The city asserts that the transfer in question was a sham alienation or paper alienation without any factual foundation. Specifically, the city argues that a paper alienation does not trigger the provisions of § 44–9–1(a), which provides:

"**Tax lien on real estate.**—(a) Taxes assessed against any person in any town for either personal property or real estate shall constitute a lien on the real estate. The lien shall arise and attach as of the assessment of the taxes, as defined in § 44–5–1."

This provision, the city contends, allows a real estate tax lien to automatically attach each assessment day without any further action by the tax assessor or any other official. The city argues that the Legislature intended such liens to automatically attach against the property, as a matter of public policy, so that a municipality may enforce the lien if the taxpayer does not pay the taxes. Section 44–9–1(b) provides:

"The lien shall terminate at the expiration of three (3) years thereafter if the estate has in the meantime been alienated and the instrument alienating the estate has been recorded; otherwise, it shall continue until a recorded alienation of the estate. The lien shall be superior to any other lien, encumbrance, or interest in the real estate whether by way of mortgage, attachment, or otherwise, except easements and restrictions."

The city asserts that subsection (b) provides a safe harbor for three years for a tax lien as well as an "at-risk" period

---

7. The deed was signed and notarized, and the transfer, according to the trial justice, did not fail for want of consideration because the

transferring of the premises in exchange for forbearance and release of the mortgage served as sufficient consideration.

beyond the three years until the property is alienated. The city contends that the lien continues until enforced by a tax sale or terminated by alienation and correctly notes that subsection (b) of § 44–9–1 establishes a statutory priority for municipal tax liens over other encumbrances, including mortgage liens and attachments. According to the plain meaning of subsection (b), an actual alienation of the property must occur to trigger a termination of the lien and, according to the city, the transfer by Elmgrove to First Bank was a sham alienation.

Alternatively, the city argues, pursuant to G.L.1956 § 45–15–5,[8] that it is not responsible to reimburse the defendant/purchasers herein because they failed to file a claim for monetary relief. The city cites *Shackleton v. Coffee 'An Service, Inc.*, 657 A.2d 544, 545 (R.I.1995) (per curiam), noting this Court's reference to § 45–15–5 as it pertains to the proper presentment methods and procedures for filing claims for monetary relief against a municipality. In addition, the city asserts that the fact that each purchaser accepted a deed from the city collector and recorded it *after* being served in the present proceeding constituted an election of remedies. Therefore, the city submits, the purchasers either must accept the deed and defend it or reject the deed and seek reimbursement.

Finally, the city and Bears Brothers argue that the city's enforcement of the real estate liens by serving Elmgrove and First Bank with notice of the impending sale for nonpayment of taxes and by providing notice by publication in accordance with the provisions of § 44–9–11, all of which occurred before Elmgrove conveyed the lots to First Bank, amounted to enforcement of the liens and precluded their termination pursuant to § 44–9–9. To support their argument, defendants cite *Fitzpatrick v. Tri–Mar Industries, Inc.*, 723 A.2d 285 (R.I.1999) (per curiam), in which this Court addressed whether an alienation of property effectively would terminate a municipality's tax lien pursuant to § 44–9–1(b). Specifically, we held that "[a] sale made after the three-year statutory period but *before an attempted enforcement of a tax lien* serves to block the enforcement." *Fitzpatrick*, 723 A.2d at 286 (citing *Rathbun v. Allen*, 63 R.I. 109, 114–15, 7 A.2d 273, 276 (1939)). (Emphasis added.) Thus, defendants argue that even if the quitclaim deed from Elmgrove to First Bank could be construed as an alienation, the deed's conveyance was not timely because the collector already had begun enforcement proceedings. In short, the city contends that an alienation of the property after the initiation of enforcement proceedings does not operate as a termination of the liens; the city already had notified the parties of the impending sale and had taken all necessary steps to enforce its liens.

Bears Brothers also argues that when Elmgrove, the mortgagor and record owner, conveyed the lots to First Bank at "the eleventh hour" via quitclaim deed dated

---

8. General Laws 1956 § 45–15–5 provides:

"**Presentment to council of claim or demand against town.**—Every person who has any money due him or her from any town or city, or any claim or demand against any town or city, for any matter, cause, or thing whatsoever, shall take the following method to obtain what is due: The person shall present to the town council of the town, or to the city council of the city, a particular account of that person's claim, debt, damages, or demand, and how incurred or contracted; which being done, in case just and due satisfaction is not made to him or her by the town or city treasurer of the town or city within forty (40) days after the presentment of the claim, debt, damages, or demand, the person may commence his or her action against the treasurer for the recovery of the complaint."

May 17, 2000, and bearing no tax stamps,[9] this conveyance was a gratuitous transfer. Additionally, Bears Brothers contends that the tax collector was justified in proceeding with the public sale of the properties because the five checks issued by First Bank amounted to a partial tax payment that did not satisfy a portion of the 1997 taxes and all of the 1998 and 1999 taxes. In essence, Bears Brothers asserts that First Bank's last-minute payment merely reduced the purchase price for each parcel that the collector sold. As a result, the purchasers, unaware of First Bank's eleventh-hour contrivance, purchased these lots and duly recorded the deeds in July 2000, after the alleged "payment ploy" was disclosed. Similar to the argument set forth by the city, Bears Brothers contends that Elmgrove and First Bank were fully aware that the city had begun enforcement proceedings and that the properties were scheduled to be auctioned for nonpayment of taxes. Although knowledge of the impending sale served to motivate the sham alienation and other "devious conduct" by Elmgrove and First Bank, the city's efforts to enforce the liens defeated their eleventh-hour termination.[10]

The plaintiff counters that the consideration for the transfer was First Bank's discharge of its $201,000 mortgage on the property. Since the city chose not to pursue discovery in this case, First Bank argues, the city cannot conclude, without any basis in fact, that the transfer was not a true alienation. Although First Bank admits that the city's interpretation of § 44–9–1 is correct in that subsection (b) does grant municipalities a superlien for three years from the date of a tax assessment,

plaintiff argues that the city and its tax collectors must move to enforce the lien or risk losing its superlien priority status. The plaintiff contends that the liens in question were "at risk" for a long period before the transfer on May 17, 2000. As a result, the city knew or should have known that its failure to enforce the liens would result in the loss of its superlien priority status. Thus, the city failed to protect its superlien for the 1995, 1996 and 1997 taxes.

Because we are of the opinion that the conveyance to First Bank by Elmgrove, made after the city undertook the necessary steps to enforce its tax liens by notice to the taxpayer and mortgagee, including notice by publication, does not operate as a termination of the city's tax liens, we need not address whether the conveyance was a sham or paper transaction or whether the trial justice erred in ordering the city to reimburse the defendant/purchasers for the sums expended at the tax sale.

This Court previously has held that "[t]he authority for the sale of real estate for delinquent taxes must be found in the statutes and such statutes will not be enlarged by judicial construction but will be strictly construed in favor of the owner." *Parker v. MacCue*, 54 R.I. 270, 272, 172 A. 725, 726 (1934). In general, "taxes that are assessed against a person's real or personal property are a lien against his [or her] real estate for a period for at least three years" and, other than an easement or restriction of record "is superior to any other lien, encumbrance or interest in the property[.]" *Picerne v. Sylvestre*,

---

9. Bears Brothers asserts that the lack of the tax stamps illustrates Elmgrove's "aversion to taxation."

10. Bears Brothers asked this Court to "Imagine the chaos that would ensue if every long-

term tax delinquent resorted to this plot on the eve of every tax sale * * * [and further, imagine] the loss of tax revenue to the municipality and the hazards to tax sale purchasers."

113 R.I. 598, 599, 324 A.2d 617, 618 (1974). But the priority status of the lien is not without limits. Pursuant to § 44–9–1(b), the lien terminates after the expiration of three years if the property has been alienated and the instrument has been recorded. Although the language of subsection (b) does not distinguish between an alienation solely intended to operate as a termination of a municipality's tax lien, or a good faith sale or transfer, in *Parker,* we had occasion to determine whether a tax lien terminated upon alienation of the property after two (now three) years from the date of attachment and "before the giving of notice by advertisement of the sale[.]" *Parker,* 54 R.I. at 272, 172 A. at 726. In that case, the collector sought to enforce tax liens of the then Town of Warwick, imposed on previous owners of the subject real estate that was acquired by the complainants by mortgagee's deed several years before the tax collector served them with notice that he intended to sell the property for back taxes. The collector argued that by making an entry in a public record book maintained by the city clerk and identified as the levy book within the two-year lien period, he had "thereby commenced proceedings for a sale of the property, and that the lien was extended by such commencement of proceedings" well beyond the time the property was conveyed. *Id.* We rejected the collector's argument that, assuming *arguendo,* a notation in a levy book operated "as the first step toward selling" the property thereby extending the lien, it could not be extended indefinitely. Because the statute did not fix a period in which the lien could be extended, we held that it was limited to a reasonable time. We upheld an injunction against the sale because the complainants had acquired title in the interim. We noted that "the collector could have reasonably continued a sale from time to time beyond the period of two years without

losing the lien, provided the sale was first duly advertised to be held on a date within said period." *Id.* at 274, 172 A. at 727. We reached this conclusion based on the statutory provision that a duly advertised tax sale may be adjourned from time to time without losing its validity. *See also Kettelle v. MacCue,* 54 R.I. 276, 172 A. 728 (1934) (this Court adopted the holding in *Parker,* that a tax lien expires at the end of two years and entry in a levy book is insufficient to extend its life). We have not deviated from this holding, notwithstanding the numerous amendments to the tax code.

In *Rathbun v. Allen,* 63 R.I. 109, 7 A.2d 273 (1939), this Court upheld a decree permanently enjoining the tax collector for the Town of East Greenwich from selling two parcels of real estate for nonpayment of taxes on the ground that the property was acquired by the complainant, the mortgagee, in accordance with the power of sale in the mortgage. The mortgagee's deed was duly recorded on April 15, 1935. More than two years after this conveyance, on May 20, 1937, the respondent first advertised the properties for sale for nonpayment of taxes that were assessed to the previous owners from 1931 to 1934. We concluded that a transfer of title by mortgage foreclosure was an alienation within the tax lien statute sufficient to defeat the collector's lien. Further, in accordance with our holdings in *Parker* and *Kettelle,* both *supra,* because the taxes "had been assessed more that two years *before any attempt was made to enforce any lien upon either of these properties for any of these taxes,*" we concluded that the liens terminated several years before the town undertook enforcement procedures. *Rathbun,* 63 R.I. at 115, 7 A.2d at 276. (Emphasis added.) Finally, in *Fitzpatrick,* an appeal by the City of Providence from a judgment that it was not a secured credi-

tor in a receivership proceeding, we upheld the finding of the trial justice that a sale by the receiver of property for which back taxes were outstanding but were not listed on municipal tax lien certificates served to defeat the city's secured lienholder status. Citing *Rathbun*, we concluded that "[a] sale made after the three-year statutory period *but before an attempted enforcement of a tax lien serves to block the enforcement.*" *Fitzpatrick*, 723 A.2d at 286. (Emphasis added.)

In the case before us, although three years had passed from the date the liens were attached, the property had not been alienated in the meantime. It was only after the tax collector notified the taxpayer and its mortgagee of the city's intention to sell the property and undertook all necessary steps to enforce the city's liens that a conveyance to First Bank was recorded. We are not confronted with the dubious situation in which the collector undertakes enforcement of the city's liens by an entry in a levy book but subsequently fails to conduct the tax sale and argues that the lien continues indefinitely, notwithstanding a subsequent conveyance. Here, the city acted, albeit after three years, to enforce its right to collect the taxes it was owed; it notified the proper parties and advertised the impending tax sale. It was only after the city undertook enforcement proceedings that Elmgrove conveyed the property to First Bank. Although the initial three-year lien period had lapsed, we are satisfied the city's "attempted enforcement of [its] tax lien[s]" defeats plaintiff's termination argument. *Fitzpatrick*, 723 A.2d at 286. Accordingly, in the context of this case, the liens survived the conveyance to plaintiff and did not terminate pursuant to § 44–9–1(b).

■ In reaching this conclusion, we are mindful of the chaos that would result from a contrary reading of this statutory provision. According to First Bank, a taxpayer could fail to pay his or her property taxes and wait until the city or town serves notice of its intention to conduct a tax sale. By simply conveying the property and recording the deed at any point before the gavel falls, a taxpayer can defeat any lien that is more than three years old. This has never been the law in this state and we refuse to hold otherwise. Clearly, the three-year period provided by § 44–9–1, during which the state's municipalities enjoy protected lienholder status, ought to afford sufficient time to enforce a tax lien. However, once a city or town, consistent with its statutory requirements, formally undertakes enforcement procedures, a subsequent alienation does not defeat the municipality's right to conduct a tax sale or convey a valid tax deed.

Our holding today is reasonable, consistent with our previous decisions, and recognizes the balance between the rights attendant to property ownership and the authority of a municipality to collect its taxes. We note that First Bank was not without a remedy: it could have foreclosed on the mortgage and paid the outstanding taxes, or purchased the lots at the tax sale. Further, First Bank could have redeemed the lots from the various defendant/purchasers within one year from the tax sale. Pursuant to § 44–9–21, any interested person may redeem property previously sold for nonpayment of taxes by paying to the purchaser or the person to whom an assignment of tax title has been made, "at any time prior to the filing of the petition for foreclosure [of all rights of redemption], * * * the original sum and intervening taxes and costs paid by him or her, plus a penalty as provided in § 44–9–19," ten percent of the purchase price if redeemed within six months from the sale and an additional one percent for each succeeding month. Thus, after acquiring

the property from Elmgrove, either by foreclosure or to satisfy Elmgrove's debt, First Bank could have paid the taxes before the sale or redeemed the property in accordance with this orderly statutory scheme. First Bank, as a sophisticated commercial lending institution, clearly was aware of its options in attempting to safeguard its secured creditor status and easily could have undertaken the necessary but more expensive steps to protect its interests. Instead, the plaintiff deliberately embarked upon a course of conduct designed to frustrate the city's lawful attempts to collect what was owed. We are of the opinion that it did so at its peril.

## Conclusion

Accordingly, for the reasons stated herein, the defendants' appeals are sustained and the judgment is vacated. The papers in the case are remanded to the Superior Court.

Justice FLAHERTY did not participate.

FLANDERS, J., dissenting.

A statute, G.L.1956 § 44–9–1(b), provides that, three years after a municipality assesses a tax on property for a given tax year, the municipal tax lien created by the assessment "shall terminate" upon the recorded alienation of the real estate subject to the lien. Nevertheless, by their decision in this case, two members of this Court have carved out a judicial exception to the statute by holding that a recorded alienation of the real estate will not terminate the tax lien if the municipality has begun the process of putting the property up for tax sale when the recorded alienation occurs. Because I believe that the plain meaning of § 44–9–1(b) precludes such an interpretation of the statute, I respectfully dissent.

In § 44–9–1(b), the Legislature has specified that tax liens on real estate "*shall*

*terminate* at the expiration of three (3) years thereafter if the estate has in the meantime been alienated and the instrument alienating the estate has been recorded; otherwise, it shall continue *until a recorded alienation of the estate.*" (Emphases added.) This unambiguous language conspicuously omits any provision limiting or preventing tax-lien terminations when alienation occurs *after* a municipal lienholder has initiated but not completed the tax-sale process. Rather, by its terms, the statute affords municipalities three years from the date of the property-tax assessment to initiate tax-sale proceedings as a superior lienholder. If a city or town proceeds to a tax sale within this period, then it does so without incurring any risk that an intervening alienation of the property will subvert its lien-enforcement attempt. But all that changes upon the expiration of three years from the assessment date. After three years, § 44–9–1 allows the lien to continue on the property but only "until a recorded alienation of the estate." Thus, once such an alienation occurs, then the statute mandates that the lien "shall terminate"—regardless of whether, in the meantime, the municipality has initiated efforts to sell the property at a later tax sale.

As we often have noted, "when a statute expresses a clear and unambiguous meaning, the task of interpretation is at an end and this [C]ourt will apply the plain and ordinary meaning of the words set forth in the statute." *State v. Bryant,* 670 A.2d 776, 779 (R.I.1996). " 'If the language is clear on its face, then the plain meaning of the statute must be given effect' and this Court should not look elsewhere to discern the legislative intent." *Henderson v. Henderson,* 818 A.2d 669, 673 (R.I.2003) (per curiam) (quoting *Fleet National Bank v. Clark,* 714 A.2d 1172, 1177 (R.I.1998)). When "a statutory provision is unambigu-

ous, there is no room for statutory construction and we must apply the statute as written." *In re Denisewich,* 643 A.2d 1194, 1197 (R.I.1994). In interpreting an unambiguous statute, we presume that each word was expressly intended by the Legislature, and we are under a duty to "give effect to every word, clause, or sentence." *Bryant,* 670 A.2d at 779.

In addition, we have emphasized that, in the context of a municipal tax sale, "[t]he authority for the sale of real estate for delinquent taxes must be found in the statutes and *such statutes will not be enlarged by judicial construction but will be strictly construed in favor of the owner.*" *Parker v. MacCue,* 54 R.I. 270, 272, 172 A. 725, 726 (1934). (Emphasis added.) Treatises on the subject also have recognized the need for strict adherence to the letter of tax-sale statutes when courts interpret these provisions:

> "Statutes governing the procedures whereby an owner may be divested of his or her property for the nonpayment of taxes will be strictly construed against the taxing authority. Careful adherence to the requirements in such laws, and to orders made pursuant to them, are required. In order to divest an individual of his or her property against his or her consent, every substantial requirement of the law must be complied with." 16 Eugene McQuillin, *The Law of Municipal Corporations,* § 44.152 at 612 (3d ed.1994).

Here, Elmgrove Associates (Elmgrove), the record owner, failed to pay the taxes assessed for its Hartford and Glenbridge Avenue parcels for the years 1995 through

1999. In March 2000, the city notified Elmgrove that these parcels were to be sold at a tax sale for unpaid taxes due and owing. During that same month the city also notified First Bank and Trust (First Bank), the mortgagee for these same parcels, of the impending tax sale, on May 18, 2000; the city also proceeded to advertise the tax sale according to the provisions described in § 44-9-9. But before the tax sale could occur, Elmgrove alienated the property on May 17, 2000, by executing a quitclaim deed to First Bank; it then recorded that alienation in the city's land-evidence records. As a matter of law (per § 44-9-1(b)), this event terminated any municipal tax liens on the parcels for taxes that had been assessed more than three years before the date of the recorded alienation (namely, the taxes for 1995 through 1997).

On that same day (May 17, 2000), First Bank also delivered five checks to the city tax collector's office, representing payment of the property taxes due on all the parcels in question for the outstanding tax years of 1998 and 1999. With these checks, First Bank sent a letter to the city tax collector informing her of the recorded alienation and of the payments it had made to the city for the outstanding 1998 and 1999 taxes. The letter indicated the following:

> "Enclosed is a copy of a deed that was recorded on May 17, 2000 at 2:07 p.m. and 5 checks representing the 1998 and 1999 taxes plus interest on the above lots. In view of this 'alienation' (R.I.G.L. 44-9-1) and the enclosed payment, you are directed to remove the above parcels from the tax sale scheduled for May 18, 2000." [11]

---

11. Although First Bank directed the city to apply its payments toward the outstanding 1998 and 1999 taxes, the city ignored this direction and, instead, applied the five tax payments that First Bank tendered on May 17 toward the unpaid taxes for the years 1995 through 1997. But because First Bank specified that the funds were to be applied to the 1998 and 1999 taxes, the city, upon cashing the checks, was required to apply the funds as directed. *See Albert S. Eastwood Lumber Co. v. Britto,* 51 R.I. 406, 410, 155 A. 354, 356

Despite receiving notice of the recorded alienation of the subject properties and First Bank's payment of the 1998 and 1999 property taxes, the city still proceeded with the tax sale on May 18, 2000, selling the property to Bears Brothers Realty and to the other codefendants for the remaining taxes allegedly due on the property.

When the city first noticed and advertised the impending tax sale in March 2000, each lien for the 1995 through 1997 taxes already was more than three years old. Pursuant to § 44–9–1, these liens accrued on the date of assessment, and, after three years, they continued in force thereafter only until "a recorded alienation of the estate." In my opinion, by the plain, unambiguous terms of the statute, the city's liens on the subject parcels for the tax years 1995 through 1997 terminated when Elmgrove executed a valid quitclaim deed to First Bank on May 17 and caused that deed to be properly recorded on the same day.[12] Beyond any shadow of a doubt, this event constituted "a recorded alienation of the estate," as that phrase is used in § 44–9–1(b). Thus, according to the statute, it terminated all municipal tax liens on the property for the years 1995 through 1997 because, for those years, the liens had existed for a period longer than three years. Nevertheless, because three years had not elapsed since the city assessed the taxes for 1998 and 1999, the tax liens for these years remained intact after the alienation. First Bank, therefore,

promptly tendered payment to the city tax collector's office for these unpaid taxes, thereby discharging these remaining tax liens before the tax sale. It then properly notified the city that the property no longer was subject to the tax sale on May 18, 2000. Thus, in my opinion, the city no longer held any enforceable tax liens on the real estate as of May 18, 2000. Therefore, it did not have the ability to subject the property to a tax sale on that date, and its purported sale of the properties was null and void. Consequently, I would affirm the trial justice's ruling that after Elmgrove transferred the property to First Bank and caused that deed to be properly recorded, the city's outstanding tax liens for 1995 through 1997 terminated, leaving the city with nothing more than "an unsecured tax obligation" with respect to the unpaid taxes for those years. *See Fitzpatrick v. Tri–Mar Industries, Inc.,* 723 A.2d 285, 286 (R.I.1999) (per curiam).

The majority relies on dicta from *Parker,* 54 R.I. at 274, 172 A. at 727; *Kettelle v. MacCue,* 54 R.I. 276, 277, 172 A. 728, 728 (1934); *Rathbun v. Allen,* 63 R.I. 109, 114–15, 7 A.2d 273, 276 (1939), and *Fitzpatrick,* 723 A.2d at 286, for the proposition that a conveyance of property after the city has taken steps to initiate tax-lien enforcement procedures "does not operate as a termination of the city's tax liens" on the property as provided in § 44–9–1. None of these cases, however, so holds. On the contrary, in each of them the lan-

(1931) ("It is well settled that the debtor may direct the application of a payment on account, but in the absence of such direction or a manifestation of intent [that] the payment shall be applied in a particular manner, the creditor may apply such payment in the order which he may consider most advantageous to himself."). Thus, the city had no legal basis to do what it did.

12. As the majority notes, the trial justice expressly found that the quitclaim deed was a

valid transfer of the property, and not a "sham" or "paper" transaction as the city has argued. As the trial justice observed, "This [c]ourt has reviewed the deed, however, and can find no reason to find the deed void or deficient in any manner. The deed is signed, notarized, and, although this [c]ourt is unaware of the exact deal of the transfer, it appears to contain consideration (i.e.: property in exchange for forbearance and release of the mortgage)."

guage referring to the initiation of tax-sale enforcement procedures was immaterial to the holding of those cases. Thus, unlike the majority's ruling in this case, these previous cases did not judicially create a limitation on the lien-termination provisions of § 44–9–1(b) that the Legislature did not expressly provide for in the statute. Moreover, these cases are all distinguishable from the facts of this case, and they do not assume, as the majority concludes, that once the city begins the tax-sale-enforcement procedures, no recorded alienation can terminate any tax liens. Rather, in *dicta*, they merely support the proposition that if the city begins certain tax-sale enforcement procedures during the statutory safe-harbor period *before* any recorded alienation of the property has caused the lien to terminate, then, if the tax sale had been scheduled to occur within the statutory safe-harbor period, the tax-sale date and the municipality's lien may be extended beyond that period—but only for a reasonable time.

Thus, in *Parker*, the City of Warwick possessed a tax lien on real estate for unpaid taxes assessed in 1929. On December 30, 1930, within the then-applicable two-year-statutory period for selling the property at tax sale subject to the city's tax lien, the city tax collector made an entry in the town's levy book signaling his determination to sell the property at a tax sale at an unspecified future date. *Parker*, 54 R.I. at 271, 172 A. at 726. However, the city issued no notice or advertisement of this levy or the impending tax sale until March 1933, more than two years after the statutory safe-harbor period—then two years from the date of assessment—had expired.[13] *Id.* In the meantime, Parker, the plaintiff, had received title to the real estate "by mortgagee's deeds." *Id.* at 270, 172 A. at 726. Parker brought suit, arguing that the city's tax lien should have terminated once the statutory lien period of two years had expired and the previous owner had alienated the property in the meantime. *Id.* at 272, 172 A. at 726. The city tax collector argued that because the statutes in force at the time required the collector to make an entry in the town's levy book as the initial step in the town's attempt to enforce outstanding tax liens, such an entry should be viewed as the initiation of the tax-sale process by the town, thereby precluding any lien-free alienation of the property, even after the statutory safe-harbor period expired.[14] *Id.*

While noting that the word "levy" was not used consistently in the statutes, and that "[i]t [was] significant that the statute nowhere states, either directly or by implication, that any commencement of proceedings to sell, be it levy, notice or advertising by publication, or by posting notices, shall extend the lien which is limited by statute to two years," *Parker*, 54 R.I. at 274, 172 A. at 727, the Court opined that a tax sale itself, once initiated by the city, could be "reasonably continued * * * from time to time beyond the period of two

**13.** At the time that the court decided *Parker v. MacCue*, 54 R.I. 270, 172 A. 725 (1934), and *Kettelle v. MacCue*, 54 R.I. 276, 172 A. 728 (1934), the statutory tax-lien language provided that, "All taxes assessed against the owner of any real estate shall constitute a lien on such real estate in any town, for the space of two years after the assessment, and, if such real estate be not aliened, then until the same is collected." G.L.1923, title VIII, ch. 63, § 3. *Rathbun v. Allen*, 63 R.I. 109, 111, 7 A.2d 273, 274 (1939), also applies this language from the 1923 version of the tax-lien statute.

**14.** As the Court noted in *Antuono v. Faraone*, 106 R.I. 721, 725, 263 A.2d 111, 114 (1970), in 1946 the Legislature modified the municipal tax sale procedures, "eliminat[ing] any necessity that the tax collector make any levy on tax-delinquent property to initiate * * * tax sale proceedings * * *."

years without losing the lien, *provided the sale was first duly advertised to be held on a date within said [two year] period." Id.* (Emphasis added.) The Court went on to state the following:

> "For the determination of this case it is immaterial whether the collector is required, as the first step toward selling, to make an entry in a public record book of his mental act of determination to sell. *Assuming* that it is his duty to so commence his proceeding to sell, *and that such act extends the lien,* the statute does not fix the time for which the lien is extended. It cannot be that the lien is extended indefinitely. We are by necessity driven to the old rule that when no time is fixed a reasonable time is intended. The record made by the collector of his determination to sell was made [on] December 30, 1930. By the terms of the statute the lien, without the so-called levy, continued unconditionally in force until June 15, 1931. No steps were taken before said date to hold a sale, and for a period of considerably more than two years after the so-called levy no move was made preparatory to holding a sale. Bearing in mind that the statute provided for a lien for only two years in cases where the property was aliened, it could not have been intended that a lien limited by statute to two years could by any inference be extended nearly two years by the mere act of making an entry in a public record book of the collector's determination to sell * * *." *Id.* at 274–75, 172 A. at 727. (Emphases added.)

Thus, the Court went on to hold in *Parker* that the mere entry in a levy book of the city tax collector's intention to sell the property at a tax sale—even when the levy occurred within the statutory two-year safe-harbor period for the lien—was insufficient to warrant extending the city's lien beyond that period. *See id.; see also Ket-telle,* 54 R.I. at 277, 172 A. at 728 (recognizing *Parker's* holding that a timely made levy evidenced by a book entry was insufficient to extend a tax lien beyond the statutory period and that, under the circumstances in that case, "the lien had expired"). Therefore, under the circumstances in that case, the lien had expired and the party recording the alienation of the property took title to it free and clear of the tax lien. *See id.*

It is true that the *Parker* court assumed, without deciding, that the attempted commencement of a tax sale itself, *during the statutory safe-harbor period,* could be sufficient under certain circumstances to extend the lien beyond the then two-year period for the life of a tax lien, noting that the applicable statutes allowed that tax sales, once begun by the city, "may be adjourned from time to time." *Parker,* 54 R.I. at 274, 172 A. at 727. Later cases referred to this assumption in *dicta. See Fitzpatrick,* 723 A.2d at 286 (citing to the above quoted statement in *Rathbun* as support for the proposition that "[a] sale made after the three-year statutory period but before attempted enforcement of a tax lien serves to block the enforcement"); *Rathbun,* 63 R.I. at 115, 7 A.2d at 276 (noting that, in that case "all the taxes here involved had been assessed more than two years *before any attempt was made to enforce any lien* upon either of these properties for any of these taxes"). (Emphasis added.) Although *Parker's* assumption—that a municipal tax lien might be extended beyond the statutory safe-harbor period if the tax collector initially attempted to schedule the tax sale *within this same period*—is not material to its holding, and therefore, not controlling precedent, it is, nevertheless obviously distinguishable from the facts of the case at bar.

In this case, the city did not attempt to enforce its tax liens on the real estate in

question until *after* the three-year-statutory safe-harbor period expired for the taxes that the city had assessed in the years 1995 through 1997. Thus, unlike *Parker* or any of the other cited cases, the city has not argued that it initiated any tax-sale collection procedures within the three-year safe-harbor period for preserving municipal tax liens against recorded alienations of the property. Rather, the city argues that its attempt to enforce tax liens at *any* date—even after the statutory three-year safe-harbor period already has elapsed— suspends the landowner's ability to terminate the lien before the tax sale through a properly recorded alienation of the property, as provided for in § 44-9-1(b). But such a conclusion expands *Parker's* assumption way beyond not only the plain language set forth in chapter 9 of title 44, but also way beyond the factual situation in the *Parker* case itself. Indeed, *Parker's* rationale was based solely on the power of the municipality to adjourn "from time to time" a scheduled tax sale that the city had advertised to occur *within the statutory safe-harbor period.* In this case, however, the city did not initiate its tax-sale notices and advertisements within the three-year statutory safe-haven when it could do so without risk that a recorded alienation would terminate its tax liens, much less did it schedule the tax sale itself to occur within this period. Thus, in my opinion, the trial justice properly held that the 1995 to 1997 tax liens terminated upon the recorded alienation of the property in question before any tax sale of the property.

The majority refers to "the chaos that would result from a contrary reading of this statutory provision," noting that it would allow a taxpayer to defeat any tax lien more than three years old "[b]y simply conveying the property and recording the deed at any point before the gavel falls" on a noticed and advertised tax sale. In my opinion, however, that result is exactly what § 44-9-1(b) contemplates. And no more "chaos" would result from interpreting the statute as the Legislature wrote it than the usual risk that necessarily inheres in every tax sale. A municipality selling property at a tax sale only has the power to sell by virtue of the statutes granting it that authority. *See Parker,* 54 R.I. at 274, 172 A. at 727. The city's ability to sell the parcels at issue—or any other tax-sale parcels—is always subject to the record owner stepping in before the gavel falls on the tax sale and paying the amount of money due for back taxes. Thus, merely issuing a notice and advertising a tax sale for a certain piece of property does not assure either the municipality or any prospective tax-sale buyers that a sale actually will occur on that day because it is always possible that someone will pay the taxes and any other money due in the meantime. *See* § 44-9-8 (requiring the collector to sell property at public auction for unpaid taxes only "[i]f the taxes are not paid").

Therefore, the mere fact that the city has advertised a proposed tax sale does not mean that the sale actually will occur. After all, an interim payment of the outstanding tax obligation—or, after the three-year safe-harbor period has expired, a recorded alienation of the property—still may serve to interdict such a sale before the tax-sale gavel can fall. And even when the sale occurs, a buyer of such property necessarily assumes many risks, including the risk that the buyer can take only what title the city can give, subject not only to the doctrine of caveat emptor but also to the taxpayer's one-year right of redemption, as provided by § 44-9-21, § 44-9-19, and § 44-9-25. As a well-known commentator on municipal law has recognized:

"A purchaser at a tax sale is a stranger to the title. The purchaser takes without warranty and subject to the doc-

trine of caveat emptor. His or her rights and title depend upon the validity of the sale, and upon applicable statutory and charter provisions. Usually, property sold for taxes is subject to redemption within a prescribed time, and the purchaser's right to the property is not absolute until the expiration of such period." McQuillin, § 44.161 at 636.

Moreover, in this day of ubiquitous cell phones and pagers, a would-be purchaser of property at a tax sale easily can afford to have someone monitoring the registry of deeds until the tax sale is concluded to alert the potential purchaser about any last-minute sales or transfers that are recorded in the land-evidence records, thereby triggering the lien-termination provisions of § 44–9–1(b). Because only a recorded alienation is sufficient to trigger the statute's lien-termination provision, a potential purchaser at a tax sale readily could ascertain the tax sale's validity by monitoring what deeds have been and are being recorded at the registry right up until the gavel falls.

In any event, such an "eleventh-hour" recorded alienation would operate only to extinguish those tax liens for which the city failed to complete its lien-enforcement process before the statutory safe-harbor period expired. When the city has failed to put the property up for tax sale during the three-year safe-harbor period prescribed by statute, then the city has placed itself at risk that its tax lien will terminate by a recorded alienation of the property before it can sell the property at a tax sale, and buyers at tax sales necessarily take the property subject to this risk. The plain language of this unambiguous statute mandates exactly this result. Thus, if would-be buyers at a tax sale believe that this statutory scheme creates too big a risk for them to stomach, then they can

and should beat a well-worn path to the General Assembly's door and plead for an amendment to § 44–9–1(b) that better suits their needs. But this Court should not judicially create such a gaping loophole in the law when none exists in the statute.

For these reasons, I would affirm the trial justice's decision, deny the appeal, and remand the papers in this case to the Superior Court.